**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | |
|---|---|
| JEFFREY BUDISH; and<br>GALE BUDISH;<br><br>Plaintiffs,<br><br>v.<br>AYRES ASSOCIATES INC.;<br>CHEMDESIGN PRODUCTS, INC.;<br>CHEMGUARD, INC.;<br>JOHN DOE DEFENDANTS 1-20;<br>JOHNSON CONTROLS, INC.;<br>ROBERT E. LEE & ASSOCIATES,<br>INC.;<br>SEVENSON ENVIRONMENTAL<br>SERVICES, INC.; and<br>TYCO FIRE PRODUCTS, LP.,<br><br>Defendants. | **MDL NO. 2873**<br><br>**Master Docket No.: 2:18-mn-2873-RMG**<br><br>**JUDGE RICHARD GERGEL**<br><br>**Civil Action No.:  2:23-cv-3189-RMG**<br><br>**COMPLAINT AND**<br>**JURY DEMAND** |

_____

NOW COME the above-named Plaintiffs, by their attorneys, The Previant Law Firm, S.C., and as and for a claim for relief, allege and show to the court as follows:

<u>**INTRODUCTION**</u>

1.      Plaintiff Jeffrey Budish brings this complaint against Defendants for the claims set forth below resulting from their intentional, knowing, reckless and/or negligent acts and omissions in connection with the discharge, distribution, disposal pollution and/or spraying of per- and polyfluoroalkyl substances and their constituents ("PFAS"), including the resultant contamination of real property owned, and drinking water supplies owned and used, by Plaintiffs.

2.      Plaintiff Gale Budish brings this complaint against Defendants for the claims set forth below resulting from their intentional, knowing, reckless and/or negligent acts and omissions

in connection with the discharge, distribution, disposal pollution and/or spraying of per- and polyfluoroalkyl substances and their constituents ("PFAS"), including the resultant contamination of real property owned, and drinking water supplies owned and used, by Plaintiffs.

3.    For this Complaint, Plaintiffs intend the term "PFAS" to include all listed compounds that the Wisconsin DNR expects laboratories to report when conducting testing for PFAS,                                    available                                    at https://dnr.wisconsin.gov/sites/default/files/topic/PFAS/LabUpdate20210301.pdf.

4.    Defendants' PFAS chemicals, including without limitation perfluorooctanoic acid ("PFOA") and perfluorooctanesulfonic acid ("PFOS"), were used and released into the environment, nearby resources and property from a large facility and testing ground known as the Ansul Fire Technology Center ("AFTC" or the "Site"), a 380-acre property that serves as an active fire suppressant training, testing, research and development facility in Marinette, Wisconsin.

5.    Tyco has been manufacturing and/or using AFFF containing or breaking down into PFAS for over 50 years at its AFTC Site in Marinette County.

6.    PFAS and AFFF products containing or breaking down into PFAS manufactured by Defendants Chemguard and ChemDesign were likewise used at Tyco's AFTC facility for many years.

7.    As a result of the aforementioned PFAS discharges and Defendants' actions and omissions, nearby drinking water sources, surface waters, and other natural resources and properties have been heavily contaminated with toxic PFAS compounds.

8.    Defendants to this case have been the target of several lawsuits across the State of Wisconsin as result a of their tortious conduct, including open ground sprayers, dumping and release of these toxic substances in Wisconsin soil, its waterways, aquafers, and air.

9.      Defendants' conduct has harmed both the whole of Wisconsin, Marinette County and Plaintiffs.

10.     As a result of this conduct, explained below, Plaintiffs' property has been greatly damaged.

**THE PARTIES**

11.     Plaintiffs Jeffrey and Gale Budish, husband and wife (collectively "the Budishes") are adult residents of Porterfield, County of Marinette, State of Wisconsin, owning and living on their property and residence at N3415 Rehms Road, Peshtigo Wisconsin, 54157 ("Budish Residence" "Plaintiffs' property" or "the property")

12.     Defendant Tyco Fire Products, LP ("Tyco") is a Delaware limited partnership with its principal place of business in Marinette, Wisconsin.

13.     Tyco is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul"). Tyco is an indirect subsidiary ultimately wholly owned by Johnson Controls International plc ("JCI"), public limited company of Ireland  listed on the New York Stock Exchange.

14.     At all relevant times, Tyco and/or Ansul (collectively, "Tyco/Ansul") designed, developed, manufactured, marketed, sold, distributed, supplied, transported, handled, tested, used, and/or released aqueous film-forming foam ("AFFF")  that contained PFAS, including in Wisconsin.

15.     At all times relevant to the present litigation, Tyco designed, manufactured, and tested AFFF, and conducted research, development and training activities using AFFF at the AFTC.

16.     Defendant Johnson Controls is a domestic business with its principal office at 5757 North Green Bay Avenue, Milwaukee, Wisconsin 53209.

17.     On or around September 2, 2016, Johnson Controls merged with a subsidiary of Tyco's parent company, Tyco International plc, named Jagar Merger Sub LLC. Johnson Controls was the surviving corporation. After the merger, Tyco International plc changed its name to Johnson Controls International plc. Johnson Controls is neither a parent nor subsidiary of Tyco.

18.     Upon information and belief, since on or around September 2, 2016, Tyco and Johnson Controls have had a services agreement in which Johnson Controls provides certain services, including environmental consulting and management, to Tyco.

19.     Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation with its principal place of business in Marinette, Wisconsin.

20.     Though a Texas corporation, ChemDesign operates its business principally and solely out of its 2 Stanton Street, Marinette, Wisconsin 54143-2542 address.

21.     ChemDesign's website lists only 2 Stanton Street, Marinette, Wisconsin as its business address.[1]

22.     ChemDesign's Texas corporation registration lists two addresses, neither of which are principal places of business:

> a. 1108 Soldiers Field Dr Ste 150 Sugar Land, TX 77479-400 is listed; Though this is listed as ChemDesign's mailing address, there is no evidence of ChemDesign ever operating or conducting any business at that location.

---

[1] https://chemdesign.com/our-site/

      b.  1436 West Gray, PMB 353 Houston, TX 77019; This is the address of their registered agent. There is no evidence of ChemDesign ever operating or conducting any business at that location.

23.    For these reasons, ChemDesign is a citizen of Wisconsin.

24.    At its Marinette location, ChemDesign designed, developed, manufactured, marketed, sold, distributed, supplied, transported, handled, tested, used, and/or released fluorosurfactants containing PFAS for use in AFFF products, including in Wisconsin.

25.    Defendant Chemguard Inc. ("Chemguard") is a Texas corporation with its principal place of business in Marinette, Wisconsin.

26.    Chemguard is a subsidiary of Johnson Controls International plc., acquired by Tyco/Ansul in 2011.

27.    Though a Texas corporation, Chemguard operates its business principally and solely out of its One Stanton Street, Marinette, Wisconsin 54143-2542.

28.    Chemguard's website lists only One Stanton Street, Marinette, Wisconsin as its business address.[2]

29.    Chemguard's Texas corporation registration lists two addresses, neither of which are principal places of business:

      a.  Chemguard's mailing address is listed in Wisconsin: PO Box 591, Milwaukee, WI, 53201-0591.

      b.  Chemguard's Texas registered agent is a CT Corporation System at 1999 Bryan St. Ste. 900 Dallas, TX 75201; there is no evidence of Chemguard ever operating or conducting any business at that location.

---

[2] https://www.chemguard.com/contact/index.htm

30.     For these reasons, Chemguard is a citizen of Wisconsin.[3]

31.     At all relevant times, at its Marinette location, Chemguard designed, developed, manufactured, marketed, sold, distributed, supplied, transported, handled, tested, used, and/or released fluorosurfactants containing PFAS for use in AFFF products.

32.     Defendant Robert E. Lee & Associates Inc. ("Robert E. Lee") is a Wisconsin corporation with its principal place of business in Wisconsin.

33.     At all relevant times, Robert E. Lee was the general contractor and/or lead engineer for the Menekaunee Harbor Improvements Project in Marinette County.

34.     Defendant Ayres Associates Inc. ("Ayres") is a Wisconsin corporation with its principal place of business in Wisconsin.

35.     At all relevant times, Ayres was an engineer for the Menekaunee Harbor Improvements Project in Marinette County.

36.     Defendant Sevenson Environmental Services ("Sevenson") is a New York corporation with its principal place of business in New York.

37.     At all relevant times, Sevenson was the environmental contractor for the Menekaunee Harbor Improvements Project in Marinette County.

38.     Doe Defendants 1-20 are unidentified entities or persons whose names are now unknown and whose actions, activities, omissions (a) may have permitted, caused, and/or contributed to the PFAS contamination of Marinette County and the Budishes' damages set forth throughout; or (b) may be vicariously responsible for entities or persons who permitted, caused,

---

[3] Defendants apparently concede that Chemguard and ChemDesign are Wisconsin citizens. In recent litigation filed by the State of Wisconsin against several PFAS manufacturers, Tyco, Chemguard and ChemDesign were all named defendants. Tyco, Chemguard and ChemDesign were the only defendants in that case with principal places of business in Wisconsin. Tyco and Chemguard removed that action to federal court, but in so doing, did not claim they were diverse from plaintiffs, waiving the argument that they were not Wisconsin citizens. Additionally, ChemDesign has expressly admitted its Wisconsin citizenship in prior litigation.

and/or contributed to the contamination of Marinette County and the Budishes' damages set forth throughout; or (c) may be successors in interest to entities or persons who permitted, caused, and/or contributed to the contamination of Marinette County and the Budishes' damages set forth throughout. After a reasonable search and investigation to identify the Doe Defendants, actual names, the Doe Defendants' actual identities are unknown to the Plaintiff as they are not linked with any of Defendants on any public source. Said entities/persons are being named herein by a fictitious name as provided for in Section 807.12 of the Wisconsin Statutes.

39.     Defendants Tyco/Ansul, Johnson Controls, ChemDesign, Chemguard, Ayres, Robert E. Lee, Sevenson and Doe Defendants 1-20 will be collectively "Defendants" or "Defendant" throughout and will refer to all named Defendants jointly and severally.

40.     Defendants Tyco/Ansul, Johnson Controls, ChemDesign, Chemguard, and Doe Defendants 1-20 will be collectively "Manufacturing Defendants" or "Manufacturing Defendant" throughout and will refer to Defendants Tyco/Ansul, ChemDesign, Chemguard, and Doe Defendants 1-20 jointly and severally.

41.     Defendants Ayres, Robert E. Lee and Sevenson will be collectively "Menekaunee Defendants" or "Menekaunee Defendant" throughout and will refer to Ayres and Sevenson jointly and severally.

42.     At all relevant times, Defendants were each acting by and through their respective officers, directors, representatives, employees, servants, and agents, who were acting within the course and scope of their employment, service, and agency.

## JURISDICTIONAL ALLEGATIONS

43.     This action is properly brought in state court as it arises under state common law.

44.     This action is properly brought in state court because it presents claims against non-diverse parties and in-state defendants under any 28 U.S.C. 1332(a) diversity analysis.

45.     The action is properly brought in state court as there are no legal bases for jurisdiction in federal court.

46.     On June 14, 2023, Judge Gergel ruled in a similar matter that certain defendants are entitled to federal officer jurisdiction.

47.     Thus, without waiving the propriety of venue and subject matter jurisdiction, Plaintiffs directly file this matter in multidistrict litigation.

48.     The Home Venue of this matter is the Eastern District of Wisconsin, pursuant to 18 U.S.C. 1391(d).

49.     For the avoidance of the all doubt, Plaintiffs are not making any claims for any activity or use of PFAS containing materials at Fort McCoy, located over 200 miles away from Marinette County.

## PFAS BACKGROUND

50.     "PFAS" is a common term given to a number of man-made chemicals that started being used commonly in the 1940s and 1950s.

51.     PFAS are entirely man-made – there is no natural source of these compounds.

52.     There are many chemicals in the PFAS family, two of which are perfluorooctanesulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA").

53.     PFOS and PFOA have been widely used in industrial processes and in commercial products because of their propensity to repel water, dirt, oil, and grease.

54.     Originally used for nonstick coatings and paper products, Defendants here are chemical companies that designed, manufactured, tested, marketed, promoted, sold, supplied,

distributed, used, and/or disposed of PFAS, products containing PFAS, and/or products that degrade into PFAS after release into the environment (collectively, "PFAS Products"), including, but not limited to, aqueous film-forming foam ("AFFF").

55.     PFOS and PFOA have unique properties that make them persistent, bio-accumulative, and toxic.

56.     PFAS are particularly effective environmental contaminants – they are very water soluble and mobile, allowing them to easily contaminate surface and ground water and land.

57.     PFAS can also be emitted into the air, degrading air quality. PFAS presence in the air can lead to direct inhalation by humans and animals, or the PFAS eventual deposition into the water and soil in the area around emission source.

58.     PFAS are often called "forever" chemicals because they are indestructible, taking hundreds—or even thousands—of years to degrade naturally in the environment.

59.     PFAS can persist in the environment indefinitely because of the strength of multiple carbon-fluorine bonds. In other words, PFOS and PFOA break down very slowly in the environment, if at all, earning them the nickname "forever chemicals."

60.     PFAS are thermally, chemically, and biologically stable, and therefore resistant to biodegradation, atmospheric photooxidation, direct photolysis, and hydrolysis.

61.     Stated another way, once PFAS contaminate an environment, they will not break down – they must be cleaned up to free the area of PFAS.

62.     Typical water treatment systems did not and do not filter PFOS and PFOA from contaminated water because of the chemicals' physical and chemical properties.

63.     Historically, water treatment systems did not test and/or filter PFAS chemicals from the water supply.

64.     Similarly, chlorine and other disinfectants that are typically added to drinking water systems did not and do not remove PFOS or PFOA from contaminated water.

65.     Compounding the fact that PFOS and PFOA are notoriously difficult to remove from contaminated water supplies, extensive toxicology studies including the C8 Panel Study, have shown that PFOS and PFOA are readily absorbed after oral exposure and accumulate mainly in the blood serum, kidney, and liver.

66.     PFAS are also toxic to humans at extremely low levels. Even in the parts per trillion, PFAS can have devastating health impacts.

67.     PFAS chemicals are categorized by the medical and scientific communities as "endocrine disruptors," meaning they interfere with the normal functioning of the endocrine system and the reproductive and other biological processes regulated by it.

68.      PFAS exposure has been connected to a number of adverse health conditions including increased cholesterol, increased risk of cancers, such as prostate kidney or testicular cancer, thyroid disease, dysfunction and other thyroid issues, immune system dysregulation, ulcerative colitis, liver damage, decreased fertility, and a significant increased risk of Parkinson's Disease.

69.     PFAS are readily absorbed by humans through consumption or inhalation.

70.     PFAS readily accumulate through the body systems such as the brain, bone, thyroid, liver, kidneys, lungs.

71.     Once PFAS are in the body, it takes the body years to clear them out.

72.     PFAS have a half-life within the human body of anywhere from 2 to 9 years, and the chemicals are known to cross the placenta from mother to fetus and can be passed to infants through breast milk.

73.    PFAS chemicals are also known to be immunotoxic, meaning they weaken the body's immune system, leaving the body with lowered defenses to opportunistic diseases, infections and cancers and making it harder to fight them once they take hold.

74.    These characteristics contribute to a number of health risks associated with exposure to PFOS and PFOA, and these risks are present even when PFOS and PFOA are ingested at seemingly low levels.

75.    PFOS and PFOA exposure is linked to, among other injuries, increased risk in humans of cancer, including, but not limited to, kidney and reproductive cancers. PFOS and PFOA have also been linked with other physical injuries, diseases and disorders including, but not limited to thyroid disease, high cholesterol, ulcerative colitis, pregnancy-induced hypertension, chronic kidney disease, kidney failure, high cholesterol and preeclampsia, as well as reduced immunological functions including decreased responsiveness to vaccines. PFOS and PFOA have a high latency period meaning that injuries can manifest years after exposure to the chemicals.

76.    Increased PFAS ingestion affects the body's ability to appropriately respond to vaccines and to fight off infection. Medical studies have shown a significant reduction in the efficacy of vaccines in patients with significant PFAS blood levels. Most recently, studies have shown that significant PFAS chemical exposure more than doubles the risk of contracting COVID-19, and of having severe disease when infected. Significant PFAS exposure also increases, by more than five-fold, the risk of intensive care or death from COVID-19 disease.

77.    While the public's knowledge of the prevalence, and the danger, of the chemicals is recent, the PFAS industry and Defendants have known of the danger for decades.

78.    Since the 1950s, PFAS manufacturers grew more and more aware of the toxicity of PFAS, its mobility and the threat it posed to the environment if released.

79.    Tyco first began testing foam concentrate at the AFTC in or around 1962.

80.    At that time, this foam concentrate was manufactured by 3M, and was tested in combination with a dry chemical. Tyco became a distributor of the 3M-made foams and continued testing at the AFTC into the 1970s.

81.    In 1973, Tyco partnered with a chemical manufacturer to develop a telomer-based foam concentrate also containing PFAS. This product was introduced between 1973-1975 and then Tyco terminated its distribution of the 3M foams.

82.    In 1988, Tyco began providing third party laboratory scale testing services of foam agents for end users' and distributors' annual performance evaluation requirements.

83.    By the late 1970s, 3M had confirmed internally that PFOS and PFOA had been detected in human blood, i.e., that the chemicals had spread far beyond the immediate site of their application and were "more toxic than anticipated." The company, however, withheld information concerning these chemicals' toxicity from the EPA and other regulators for decades.

84.    E.I. Du Pont de Nemours and Co. ("DuPont"), which had worked closely with 3M on research concerning PFOS and PFOA since at least the 1970s, likewise recognized many PFOA was toxic and needed to be handled with extreme care and likewise withheld this and other information from regulators and the public.

85.    By the late 1970s, Tyco was also aware of environmental and toxicity concerns with respect to its AFFF products due to their inclusion of fluorosurfactants. Indeed, in 1976, the Navy awarded Tyco a contract to study the environmental characteristics of AFFF. After studying

nine AFFF components, including fluorocarbon and hydrocarbon surfactants and solvents, Tyco concluded that AFFF toxicity was related to the surfactants.

86.    By 1981, at the latest, Tyco had further become aware of 3M research concerning the toxicity of fluorosurfactants, such as tests that showed potential birth defects from oral ingestion of fluorinated surfactants by pregnant rats.

87.    In 1999, one of 3M's chief scientists resigned over the company's failure to dedicate sufficient resources to the investigation of PFOS's harms, calling the chemical the "most onerous pollutant since PCB[.]" The scientist copied the EPA on his resignation letter.

88.    In 2000, 3M "voluntarily" ceased production of certain PFAS compounds, including PFOS and PFOA, under EPA pressure.

89.    Despite their knowledge of the harmful properties of PFAS chemicals, following 3M's withdrawal from the PFOA/PFOS market beginning in or around 2000, manufacturers of AFFF, Manufacturing Defendants, made renewed commitments to protect their lucrative AFFF line of business.

90.    In 2001, in response to concerns expressed by the EPA regarding the environmental viability of AFFF, a lobbying group known as the Firefighting Foam Coalition ("FFFC") was formed, partly to dispel such concerns. Tyco was a founding member of the FFFC. Both Tyco and Chemguard are current members.

91.    The FFFC lobbied hard for AFFF. At conferences, in journals, and in meetings with the military, the EPA, and other regulators, it repeated a key talking point: only one PFAS chemical, PFOS, had been taken off the market. Thus, the FFFC asserted, since the FFFC members' products did not contain PFOS (but rather PFOA and other PFAS chemicals, which

Tyco and others knew were equally harmful to the environment and public health), their products were safe.

92.     Various AFFF manufacturers, including Tyco and Chemguard, eventually transitioned to the use of short-chain fluorotelomers with a maximum of six carbon atoms, claiming those chemicals are safer to environmental and human health than the longer-chain chemicals such as PFOA and PFOS.

93.      Even if such claims were true, these AFFF manufacturers could have begun much earlier to transition from long-chain to short-chain fluorotelomers. Their failure to avail themselves of what they claim is a feasible alternative to the then-current formulations of PFAS-based AFFF that substantially mitigates the risk of human and environmental harm from AFFF products only confirms that their products based on long-chain fluorotelomers were not reasonably safe for their intended applications.

94.     As members of that industry, Manufacturing Defendants knew or should have known that the PFAS-containing products they manufactured were toxic and imperiled the properties and population of the communities around them.

95.     Manufacturing Defendants knew or should have known that their conduct made PFAS contamination and pollution of the Budishes' Residence inevitable due the properties of PFAS and their normal and foreseen use, manufacture, testing,  and disposal of PFAS in industrial processes.

96.     Manufacturing Defendants were all experts in the field of PFAS Products manufacturing and/or materials needed to manufacture PFAS Products.

97.     With that expertise, Manufacturing Defendants all had detailed information and understanding about the chemical compounds that form PFAS Products.

98.    As manufacturers and sellers of AFFF, Manufacturing Defendants all had ready access to substantial information about PFAS.

99.    This information was also accessible to Defendants as part of their ongoing involvement in various trade associations and groups formed to defend their industry, products, conduct and ultimately, their profits.

100.    Yet, rather than use their industry knowledge and expertise to warn about the dangers and prevent environmental spread, Manufacturing Defendants intentionally misrepresented the grave danger posed by PFAS products and their environmental contamination.

101.    Manufacturing Defendants used their membership in this and other industry groups to downplay the threat of environmental contamination, to protect PFAS and AFFF from public scrutiny, and to hide the dangers of PFAS from the neighboring community in Marinette County, including the Budishes.

102.    Because of their superior knowledge, and their intentional and/or negligent misinformation campaign about the dangers of PFAS, Manufacturing Defendants had a duty to disclose the truth and to act consistent with the true danger presented by PFAS.

103.    Manufacturing Defendants, however, failed to take reasonable steps to eliminate or reduce the dangers posed by their PFAS Products.

## PFAS, MARINETTE COUNTY AND THE DEFENDANTS

104.    Manufacturing Defendants are all centrally located in the same area on the Menominee River in the City of Marinette, Marinette County, Wisconsin.

105.    Marinette County abuts the Bay of Green Bay and Menominee River.

106.   Manufacturing Defendants designed, manufactured, marketed, sold, and distributed large quantities of PFAS-containing AFFF and/or other PFAS Products at all relevant times, for decades.

107.   Many residents in Marinette County, including the Budishes, use well water for their residential water supply.

108.   Manufacturing Defendants have been designing, developing, manufacturing, marketing, selling, distributing, supplying, transporting, handling, testing using, releasing, and/or ultimately polluting Marinette County from their Stanton Street manufacturing compound on the Menominee River since the 1970s.

109.   In addition to the discharges from their Stanton Street manufacturing compound, Defendants conducted outdoor open ground training exercises with PFAS-containing AFFF material at the AFTC for decades.

110.   The  AFTC is an active fire suppressant training, testing, research and development facility located at 2700 Industrial Parkway South, Marinette, Wisconsin 54143.

111.   The AFTC encompasses 380 acres including a section known as the Outdoor Testing Area, consisting of 9 acres used in connection with the Fire Training School, Research and Development, and Quality Testing activities.

112.   The remaining area of the site is used for equipment manufacturing, warehousing, offices, classrooms, and parking.

113.   The Outdoor Testing Area was constructed in 1961. Since then, it has been used to perform testing, demonstrations and training on a range of fire suppressants.

114.   The AFTC has various buildings for fire testing, research and development a quality testing activities.

115.    The AFTC hosts fire schools and foam schools during the summer months to train employees and customers on fire suppression techniques.

116.    The Hydraulics Laboratory is used to conduct performance testing of foam systems. It has an outdoor foam monitor pad which is sloped in design so that drainage of water/foam mixture is directed back into a collection system inside the building.

117.    The two Fire Test Houses have been used for indoor fire testing, including foam and foam sprinkler testing.

118.    The Cold Storage has been used for foam testing activities, test enclosure extinguishment testing and nozzle testing.

119.    The Center of Excellence contains a research laboratory and an instrument laboratory, which have been used for AFFF products.

120.    The Warehouse is used to store AFFF and PFAS products.

121.    A single firefighting event, training exercise, or product testing exercise, such as those conducted at the AFTC, results in the release of thousands of gallons of foam solution laced with PFAS that then enter and contaminate the environment.

122.    The area near the AFTC is drained by ditches, which appear to be hydraulically connected with the groundwater in and around Plaintiffs' property.

123.    Defendants have also used other locations in the City of Marinette and the Peshtigo area for activities related to AFFF products.

124.    ChemDesign leases various buildings on Stanton Street in Marinette and manufactures the fluorosurfactants Tyco uses in its foam concentrate there.

125.    Tyco rents a warehouse at 150 Pine Street in the City of Peshtigo, where it performs indoor foam proportioning of high expansion foam and foam products for research and development purposes.

126.    Tyco rents a warehouse at 3100 Woleske Rd., Marinette, that is used to store containers of foam surfactants and foam concentrate.

127.    Despite the extensive historical knowledge of the dangers of PFAS, Manufacturing Defendants efforts at testing were sporadic, half measures and only really began in earnest in the mid-2010s.

128.    Tyco began initial site investigation activities at the AFTC in 1993 to delineate the extent of soil and groundwater contamination by various contaminants. Since then, several investigation phases, including a groundwater monitoring program, have been conducted.

129.    Tyco performed testing at the AFTC property in 2013 and 2014 as part of the open investigation started in 1992, and the results indicated that PFOS and PFOA were present in the soil and groundwater at the Site and in off-Site potable wells. The 2013 sampling showed PFOA in groundwater near the Site at levels as high as 254,000 ppt.

130.    PFOS was found in groundwater at levels as high as 22,000 ppt. Other PFAS were also found in the groundwater during the 2013 sampling at similarly high levels.

131.    The 2014 groundwater sampling showed PFOA at concentrations at the Site at levels of up to 22,300 ppt and PFOS at concentrations of up to 64,000 ppt. Other PFAS were also found in the groundwater during the 2014 sampling at similarly high levels.

132.    In 2016, under investigation to delineate the extent of volatile organic compound (VOC) constituents, a subset of samples were further analyzed for PFAS.

133.    The analysis of 38 groundwater samples from locations throughout and near the outdoor testing and training area further indicated the presence of PFAS compounds.

134.    Analysis of 16 shallow soil samples in the Outdoor Testing Area also indicated the presence of PFAS compounds.

135.    Groundwater and soil data from these investigation activities were submitted to the DNR in November 2016

136.    The highest level of PFOA found in groundwater during the 2016 testing was 190,000 ppt and the highest level of PFOS found in the groundwater was 12,000 ppt.

137.    These concentrations were consistent with the sampling conducted in 2013 and 2014.

138.    Investigation of PFAS in off-Site groundwater began in 2017.

139.    This sampling identified PFAS in groundwater extending southeast, east and northeast from the Site.

140.    The groundwater data collected showed that PFAS concentrations detected in off-Site groundwater is due to PFAS transport through groundwater and historical stormwater runoff to the on-Site and off-Site ditches.

141.    Importantly the results of this testing were not reasonably available to the public, including the Budishes.

142.    At some point, Manufacturing Defendants revealed to Wisconsin DNR contamination of PFAS compounds of monitoring wells along the Menominee River, limited private drinking wells and the Bay of Green of Bay.

143.    In November 2017, Manufacturing Defendants launched an investigation of PFAS, conducted under the oversight of the DNR and the Wisconsin Department of Health Services ("DHS").

144.    Despite their historical knowledge and the testing, Defendants did not release information about the possibility of contamination until a town meeting on December 17, 2017, when it began testing on select private wells under DNR oversight.

145.    That testing, the results of which Tyco presented during a January 23, 2018 public meeting in the Town of Peshtigo with DNR and DHS, showed that eight wells had combined PFOA and PFOS detections ranging from 84 to 690 ppt (i.e., above the then-current EPA HAL of 70 ppt) and another 17 wells had detections ranging from 3.9 to 49 ppt (i.e., above the now-current EPA HAL of 0.004 ppt for PFOA and 0.02 ppt for PFOS).

146.    Ongoing sampling of wells within Peshtigo by both Manufacturing Defendants and DNR continue to show significantly elevated levels of PFAS.

147.    In 2020, it was also discovered that Manufacturing Defendants caused PFAS-contamination in municipal sludge/biosolids processing which was then used as fertilizer or soil enhancers by local farms and/or caused the soil to be contaminated with high levels of PFAS chemicals, thereby further contaminating soil, aquifers, drinking and surface water.

148.    For years, Tyco would allow its PFAS waste to enter and/or intentionally release into municipal water drains, draining into normal municipal waste sewers, facilities, and processing.

149.    This PFAS waste would go through municipal waste processing, where it would end up in biosolid waste components.

150. The PFAS-contaminated biosolids was then distributed, spread, and injected to nearby farms and fields.

151. Tyco released its PFAS waste into municipal water drains, knowing or having reason to know that the PFAS waste could contaminate municipal wastewater and wastewater processing facilities and those facilities' byproducts, including biosolids.

152. As a result, the PFAS-contaminated biosolids polluted air, soil, surface water and groundwater.

153. Beginning in March 2020, Manufacturing Defendants further conducted a one-time sampling of certain wells in the vicinity of 61 fields, as identified by WDNR, where biosolids were spread under a WDNR permit from wastewater treatment plants in the City of Marinette to which Manufacturing Defendant  had discharged PFAS-containing wastewater.

154. A total of 183 wells were sampled through August 15, 2020. PFOS and/or PFOA was detected in all of the wells sampled. PFOA and PFOS, combined, was detected at concentrations of up to 2,230 ppt.

155. In short, Manufacturing Defendants designed, developed, manufactured, marketed, sold, testing distributed, supplied, transported, handled, used, released, and/or disposed of PFAS Products in Wisconsin in a way that harmed the Budishes' property.

156. Defendants knew or should have known the risk that PFAS posed to the Marinette County residents' property and health, including the Budishes.

157. Manufacturing Defendants knew or should have known the ordinary and intended use of their PFAS Products would injure the health and property of the neighboring community, including the Budishes.

158. For decades, Manufacturing Defendants knew or should have known these discharges and releases of PFAS, and PFAS-laden materials endangered the property and the lives of Marinette County residents like the Budishes.

159. Rather than disclosing this information to Marinette County residents like the Budishes, Defendants hid both the dangers of PFAS and the fact of the contamination in Marinette County.

160. Despite this knowledge, Defendants continued decades of manufacturing, distributing, testing, and selling huge volumes of PFAS Products, knowing that its processes, testing, and disposal of those products would result in contamination for Marinette County residents' property and damage to their health, including the Budishes.

161. As a result of their conduct, Defendants contaminated the Bay of Green Bay, near which the Budishes reside with toxic PFAS chemicals.

162. Ponds, streams, ditches, and other surface waters, as well as wildlife, surrounding the AFTC and in Peshtigo have also been tested for PFAS and the results have shown alarming levels of PFOA, PFOS, and other PFAS.

163. In September 2020, DNR issued a "do not consume" advisory for deer liver harvested in and around Marinette, including in Peshtigo, due to elevated PFAS contamination.

164. Wisconsin residents have been advised to limit their consumption of fish from the Bay of Green Bay to once a week or less due to PFAS.

165. Signage warns the public against coming in contact with, using, or accidentally consuming local surface waters and foam.

166. As a result of their conduct, there is now an enormous plume of PFAS contamination throughout the surface water, ground water, air and soil in Marinette County.

167.    On or about December 17, 2018, a putative class action suit was filed in the Circuit Court of Marinette County for personal injuries and property damage arising from the Manufacturing Defendants' PFAS contamination in Marinette County. The case was removed to the Eastern District of Wisconsin and transferred to the multi-district litigation in District of South Carolina.

168.    An order approving a settlement class for property damage was approved and the case closed on August 4, 2021 ("the Class Action Settlement").

### THE MENEKAUNEE HARBOR IMPROVEMENTS PROJECT

169.    The Menekaunee Harbor ("Harbor") sits at the mouth of the Menominee River where the river meets the Bay of Green Bay at the far east end of the city of Marinette.

170.    The Harbor is less than a mile downstream of Manufacturing Defendants' AFFF manufacturing compound on the Menominee River.

171.    In 2014, the Harbor was dredged to remove contaminated sediment from the Harbor and improve navigation ("Harbor dredging project").

172.    Robert E. Lee was the general contractor and/or lead engineer on the 2014 Harbor dredging project.

173.    Ayers was an engineer on the 2014 Harbor dredging project.

174.    Sevenson was the environmental clean-up contractor on the 2014 Harbor dredging project.

175.    The Menekaunee Defendants were responsible for dredging up and removing sediment from the bottom of the Harbor.

176.    The Menekaunee Defendants were responsible for relocation of that sediment elsewhere.

177.    The sediment removed was contaminated with heavy metals, polycyclic aromatic hydrocarbons ("PAH") and PFAS.

178.    The sediment was never tested to determine its PFAS contamination at any point before or after dredging.

179.    Menekaunee Defendants dredged PFAS-contaminated sediments from Harbor and then disposed it in unlined and unsecured locations around Marinette County.

180.    One such location was at the end of Murray Street in Marinette, Wisconsin.

181.    The location at the end of Murray Street was known to the project as Lot 24.

182.    Lot 24 was not lined to protect the water table from the contaminants in the dredged material.

183.    The dredged material dumped at Lot 24 was not tested for PFAS at any point before or after disposal.

184.    The Menekaunee Defendants put no plan in place to prevent PFAS from the dredged material from leaching into the soil and water table under and around Lot 24.

185.    The Menekaunee Defendants designed and placed a stormwater management area along Lot 24, allowing stormwater contaminated by the dredged material to flow away from Lot 24 unimpeded, and pollute surrounding soil, water and air.

186.    The Menekaunee Defendants put no testing in place to determine whether PFAS from the dredged material was leaching into the soil and water table under and around Lot 24.

187.    The Menekaunee Defendants put no monitoring plan in place for the soil and water table under and around Lot 24.

188.    The PFAS-contaminated sediment leached PFAS into the soil,  surface water, ground water, air, and water supply in Marinette County.

24

189.    Menekaunee Defendants knew or should have known the sediment in the Harbor was contaminated with PFAS and other hazardous chemicals.

190.    Menekaunee Defendants knew or should have known the risk that PFAS posed to the Marinette County residents' property and health, including the Budishes.

191.    Menekaunee Defendants knew or should have known the risk that the contaminated sediment posed if dumped without proper lining and environmental protections to Marinette County residents' property and health, including the Budishes.

## THE BUDISHES AND BUDISH RESIDENCE

192.    Jeffrey Budish has lived in Marinette County, Wisconsin for approximately 40 years.

193.    Gale Budish has lived in Marinette County, Wisconsin for approximately 40 years.

194.    Jeffrey and Gale Budish have lived at Budish Residence for approximately 37 years. During that time the Defendants have been releasing PFAS contaminants into Marinette County ground, air, and its waters.

195.    The Budish Residence contains two gravel pit quarries that retain and hold water.

196.    The Budish Residence is approximately a quarter mile from the Peshtigo River.

197.    The Budish Residence is not connected to municipal water; instead, the residence gets its water from a private well at the residence.

198.    The Budish Residence has been damaged and contaminated as a result of the presence of PFAS in the home, the soil,  the air, the property, and their water.

199.    The Budish Residence has suffered damage to its fair market value as a result of the presence of PFAS in the home, the soil, the property, and the water.

200.    PFAS contamination far exceeding acceptable levels has been detected well water at the Budish Residence.

201.    Every day through the present, the Budish Residence continues to be damaged by recurring contamination within the Wisconsin Department of Natural Resources designated PFAS plume and the PFAS contaminants in the Bay of Green Bay.

202.    As a result of Defendants' conduct, PFAS has contaminated the Budish Residence's water and property, gathering in the wells, driven points, water softeners, pipes, gutters, soil, ground water, and surface waters.

203.    Defendants' PFAS toxins have also contaminated the Budish Residence's soil and home through air, water, and dust.

204.    The contamination has caused economic loss and loss of use and enjoyment of Plaintiffs' property, including, but not limited to, the loss of use of a large portion of their land, the loss of an ability to develop and use garden they had planned to put on the property, an inability to drink from their well, and the inability for the family and pets to safely enjoy their property.

205.    The Budishes were not a part of the Class Action Settlement.

## FIRST CLAIM FOR RELIEF AGAINST MANUFACTURING DEFENDANTS

## NEGLIGENCE

206.    Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

207.    Manufacturing Defendants owed a duty of care to Plaintiffs in the designing, manufacturing, transporting, using, deploying, testing, consuming, storing, disposing, emitting, discharging, distributing, or spraying of toxic chemicals, including PFAS.

208.    Manufacturing Defendants owed a duty to Plaintiffs to design, manufacture, transport, deploy, test, consume, store, dispose, emit, discharge, distribute and spray PFAS throughout Marinette County in a manner which would not cause Plaintiffs injury or harm, and Plaintiffs were foreseeable victims located within the scope of the risk created by the Manufacturing Defendants' conduct.

209.    Manufacturing Defendants negligently breached their duty of care by designing, manufacturing, transporting, using, deploying, testing, consuming, storing, disposing emitting, discharging, distributing and spraying PFAS throughout Marinette County, by failing to take steps to minimize or eliminate the release of PFAS, by failing to use alternative procedures that would not result in the release of PFAS, by failing to institute proper procedures and training for response to releases of PFAS, and by using, emitting, discharging, disposing, distributing and spraying PFAS into a populated community.

210.    Manufacturing Defendants owed Plaintiffs a duty of reasonable care commensurate with the risk of designing, manufacturing, transporting, using, deploying, testing, consuming, storing, disposing emitting, discharging, distributing, and spraying PFAS.

211.    Given the likelihood of contamination of neighboring areas, Manufacturing Defendants had a duty to investigate the extent to which PFAS used, emitted, discharged, disposed, distributed, and sprayed throughout Marinette County was likely contaminating properties.

212.    Manufacturing Defendants owed a duty to Plaintiffs to remediate, clean up or correct the release of any toxic chemicals into the environment, including the release of PFAS.

213.    Manufacturing Defendants failed to use reasonable care under the circumstances in the designing, manufacturing, transporting, using, deploying, testing, consuming, storing, or disposing toxic chemicals, including PFAS, breaching their duties in the following respects:

a.  Permitting the release of known toxic substances into the environment;

b.  Constant open ground outdoor use of known toxic substances, despite having no means for 100% recapture of the toxic substances;

c.  Allowing for storage of toxic substances in holding vessels with leaks;

d.  Failing to do regular testing of the environment despite knowledge of the toxicity of its substances;

e.  Manufacturing a toxic substance along a public waterway without ensuring that the toxic substance would not enter the water;

f.  Upon learning of the release of toxic substances, failing to act to contain, eliminate and/or remediate them;

g.  Placing their own profits over the properties and safety of the residents of Marinette County, including the Budishes;

h.  Failing to act reasonably in designing, manufacturing, transporting, using, deploying, testing, consuming, storing, or disposing toxic chemicals, including PFAS;

i.  Failing to notify residents of Marinette County, including the Budishes, of the release of toxic chemicals like PFAS;

j.  Failing to warn Plaintiffs to prevent contamination of property by to the toxic chemicals;

k.  Released PFAS-containing material through municipal waste systems, despite knowing it would be used as biosolids, for use on over 3,000 acres of nearby farms and fields, leading to further soil, water, and air contamination;

l.  Failing to employ safe methods to adequately control or eliminate PFAS discharge;

m.  Failing to use alternative procedures which would not result in the discharge of PFAS into neighboring communities;

n.  Failing to locate their PFAS processing to an unpopulated, or at least much less populated, area;

o.  Negligently disposing of the PFAS-containing waste of their manufacturing processes in a way that allowed PFAS to contaminate the environment.

214.    Contamination of and damage to the Budish Residence was reasonably foreseeable to Defendants as a result of their conduct.

215.    As a direct and proximate result of Manufacturing Defendants' negligence, toxic chemicals including PFAS were released into the environment, the ground water, the surface water, the air, and the soil, leading to the contamination of the Budish Residence.

216.    As a direct and proximate result of Manufacturing Defendants' negligence and the exposure to PFAS resulting therefrom, Plaintiffs have suffered, presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal and real property damage, loss of use and enjoyment of property, diminution in property value, and cost to remediate property.

## SECOND CLAIM FOR RELIEF AGAINST MANUFACTURING DEFENDANTS
## ULTRAHAZARDOUS/ANORMALLY DANGEROUS ACTIVITY /STRICT LIABILITY

217.    Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

218.    Manufacturing Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Marinette County constitutes an ultrahazardous activity.

219.    Manufacturing Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Marinette County is an abnormally dangerous activity and cannot be made safe by the exercise of the utmost care. The procedures used by Manufacturing Defendants in the use, emission, discharge, disposal, distribution and spraying of PFAS throughout Marinette County caused contamination of PFAS, which poses a high degree of risk to Plaintiffs.

220.    Manufacturing Defendants designed, manufactured, tested, marketed, sold, and distributed large quantities of a toxic chemical, PFAS-containing AFFF and/or other PFAS Products.

221.    Manufacturing Defendants designed, developed, manufactured, tested, marketed, sold, distributed, supplied, transported, handled, used, released, and/or disposed of PFAS Products in Marinette County in a way that caused contamination into the environment.

222.    Manufacturing Defendants tested and trained with the PFAS-containing product at AFTC in Marinette County leading to environmental contamination with high amounts of PFAS.

223.    Manufacturing Defendants knew their products, having been generated by the manufacturing of PFAS chemicals, were highly contaminated with PFAS toxins.

224.    These activities:

    a.    have a high degree, almost certain in fact, of causing significant harm to land of individuals like Plaintiffs;

    b.    cannot be made safe by the exercise of reasonable care;

    c.    are not a matter of common usage; and

    d.    were inappropriate in the locations where it took place.

225.    Manufacturing Defendants also released their PFAS-contaminated waste in municipal water drains and through municipal wastewater processing facilities, resulting in the creation of PFAS-contaminated biosolid materials which were released, sprayed, tested, distributed, and injected as fertilizer and/or soil enhancers to local farms for crops and otherwise allowed their toxic chemicals to pollute the water and soil in areas adjacent to residences like Plaintiffs' home.

226.     Manufacturing Defendants knew that their PFAS contaminants would leach into the ground water and be distributed by runoff to properties and water supplies like those owned by Plaintiffs. Manufacturing Defendants' activities injured Plaintiffs' property and provided no value added to the community.

227.    Manufacturing Defendants' ultra-hazardous activities – use, emission, discharge, testing disposal, distribution, spreading and/or spraying of PFAS-contaminated products – caused current actual harm and a high degree of risk of future harm to Plaintiffs.

228.    PFAS toxicity, persistence in the environment and in the human body, and other properties pose an inherent and extraordinary danger of lasting contamination of property and of threats to human health.

229.    The contamination of the property, drinking water, soil and surface water of Plaintiffs were all probable and foreseeable consequences from the Manufacturing Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Marinette County.

230.    Manufacturing Defendants' use, emission, discharge, disposal, testing distribution and spraying of PFAS throughout Marinette County, created a high degree of risk of harm to those who live in the surrounding area, including the Budishes, and substantially increased their risk of developing cancer and other illness, disease, or disease processes.

231.    The activities conducted by Manufacturing Defendants are exceedingly dangerous and offer little or no value to the surrounding community.

232.    Because these activities are ultrahazardous, Manufacturing Defendants are strictly liable for any damages proximately resulting therefrom.

233.    As a direct and proximate result of Manufacturing Defendants' negligence, toxic chemicals including PFAS were released into the environment, the ground water, the surface water, the air, and the soil, leading to the contamination of the Budish Residence.

234.    As a direct and proximate result of Manufacturing Defendants' conduct and the exposure to PFAS resulting therefrom, Plaintiffs now suffer, and will continue to suffer, real

property damage, out of pocket expense, personal and real property damage, loss of use and enjoyment of property, diminution in property value, and cost to remediate the Plaintiffs' property.

## THIRD CLAIM FOR RELIEF AGAINST MANUFACTURING DEFENDANTS

## PRIVATE NUISANCE

235.    Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

236.    At all times relevant hereto, Manufacturing Defendants knew or should have known PFAS to be hazardous and harmful to real property and it was substantially certain that their PFAS use, emission, discharge, disposal, distribution and spraying throughout Marinette County would contaminate injure Plaintiffs' property.

237.    Manufacturing Defendants, through the negligent, reckless and/or intentional acts and omissions alleged have contaminated real property in Marinette County and the surrounding area.

238.    Manufacturing Defendants, through the negligent, reckless and/or intentional acts and omissions alleged have released PFAS chemicals onto Plaintiffs' land and have contaminated Plaintiffs' real property, drinking water, surface water and soil.

239.    Manufacturing Defendants' contamination of Plaintiffs' real and personal property with PFAS toxins has interfered with the rights of Plaintiffs to use and enjoy their property. This interference is substantial. It has caused and is causing Plaintiffs to, among other things, refrain from fully using their property, using their contaminated soil to grow gardens, to refrain from using contaminated water to drink, and is interfering with their ability to enjoy their property or water their pets, causing significant inconvenience, and expense.

240. Manufacturing Defendants' conduct has also substantially interfered with Plaintiffs' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Plaintiff so chooses. It has reduced the value of their land.

241. Manufacturing Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs.

242. Plaintiffs, unlike the public generally, have suffered specific damages as a result of Manufacturing Defendants' tortious conduct.

243. Manufacturing Defendants' use, emission, discharge, disposal, distribution, spreading and/or spraying of PFAS-contaminated materials and the contamination of Plaintiffs' property resulting therefrom constitutes a private nuisance. This nuisance has caused Plaintiffs to suffer, and cause such suffering in the future, real property damage, out of pocket expense, personal and real property damage, loss of use and enjoyment of property, diminution in property value, and cost to remediate the Plaintiffs' property.

## FOURTH CLAIM FOR RELIEF AGAINST MANUFACTURING DEFENDANTS

### TRESPASS

244. Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

245. At all times relevant hereto, Manufacturing Defendants knew or should have known PFAS chemicals to be hazardous and harmful to real property, and it was substantially certain that their PFAS use, emission, discharge, disposal, distribution, spreading and/or spraying of PFAS-contaminated materials would contaminate Plaintiffs' property.

246.    Manufacturing Defendants, through their activities alleged allowed PFAS to enter and contaminate Plaintiffs' property.

247.    They intentionally, knowingly, and negligently gave tested, used, discharged, spread, deposited and/or sprayed toxic PFAS-contaminated materials, either through AFFF or through biosolids, knowing that those toxins would contaminate the real property and drinking water of individuals like Plaintiffs.

248.    Manufacturing Defendants also, through their activities alleged, authorized, requested, or caused others to dispose of waste in a manner which they knew was substantially likely to cause PFAS to enter and contaminate Plaintiffs' property. Through their actions in intentionally causing others to spread their waste, they intentionally, knowingly, and negligently caused PFAS-contaminated materials to enter Plaintiffs' land, home, and water.

249.    At all times, Manufacturing Defendants knew that their conduct in testing and disposing of PFAS-contaminated materials conflicted with Plaintiffs' rights in their property.

250.    At all times, Manufacturing Defendants' conduct displayed indifference to and disregard for Plaintiffs' rights to their land and health.

251.    Manufacturing Defendants, through their PFAS use and disposal activities alleged herein, failed to act in the matter of an ordinary, careful person or business.

252.    Manufacturing Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' real and personal property with PFAS toxins has interfered with the rights of Plaintiffs to use and enjoy their property and constitutes trespass and continuing trespass. Defendants' trespass has substantially impaired Plaintiffs' rights in the use and enjoyment of their Property as well property damage as alleged above.

253.    Manufacturing Defendants' trespass has also interfered with and continues to interfere with Plaintiffs' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that Plaintiffs so chose.

254.    Manufacturing Defendants' trespass has proximately caused (now and in the future) contamination of Plaintiffs' real and personal property, out-of-pocket expense, loss of use and enjoyment of property, diminution in property value, and cost to remediate the Plaintiffs' property.

**FIFTH CLAIM FOR RELIEF AGAINST MENEKAUNEE DEFENDANTS**

**NEGLIGENCE**

255.    Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

256.    Menekaunee Defendants owed a duty of care to Plaintiffs in executing their work in the Harbor dredging project.

257.    Menekaunee Defendants owed a duty to Plaintiffs to dispose of the sediment from the Harbor dredging project throughout Marinette County in a manner which would not cause Plaintiffs injury or harm, and Plaintiffs were foreseeable victims located within the scope of the risk created by the Menekaunee Defendants' conduct.

258.    Menekaunee Defendants negligently breached their duty of care by disposing of PFAS-contaminated sediment throughout Marinette County, by failing to minimize or eliminate the release of PFAS from that sediment, by failing to use alternative procedures that would not result in the release of PFAS from that sediment, by failing to institute proper procedures and training for response to release of PFAS from the sediment, and by failing to warn the Marinette County communities about the release.

259.    Given the likelihood of contamination of neighboring areas and exposure to their residents, Manufacturing Defendants had a duty to investigate the extent to which PFAS-contaminated the sediment and was emitted, discharged, disposed, distributed from the sediment, once it was dumped in Marinette County.

260.    Menekaunee Defendants owed a duty to Plaintiffs to remediate, clean up or correct the release of any toxic chemicals into the environment, including the release of PFAS.

261.    Menekaunee Defendants owed a duty to Plaintiffs to warn about the release of PFAS from the sediment dumped from the Harbor dredging project.

262.    Menekaunee Defendants failed to use reasonable care under the circumstances in the disposal of the PFAS-contaminated sediment from the Harbor dredging project breaching their duties in the following respects:

    a.   Permitting the release of known toxic substances into the environment;

    b.   Dumping toxic substances with no lining or other protective measures;

    c.   Failing to do regular testing of the environment despite knowledge of the toxicity of its substances;

    d.   Upon learning of the release of toxic substances, failing to act to contain, eliminate and/or remediate them;

    e.   Placing their own profits over the properties and safety of the residents of Marinette County, including the Budishes;

    f.   Failing to act reasonably in the relocation of PFAS-contaminated sediment from the Harbor dredging project;

    g.   Failing to notify residents of Marinette County, including the Budishes, of the release of toxic chemicals like PFAS;

    h.   Failing to warn Plaintiffs to prevent exposure to the toxic chemicals;

    i.   Designing and planning a stormwater management area that permitted contaminated storm water to flow away from Lot 24;

    j.   Failing to employ safe methods to adequately control or eliminate PFAS discharge from the sediment;

    k.   Failing to use alternative procedures or dumping locations which would not result in the discharge of PFAS into neighboring communities;

    l.   Failing to locate their PFAS processing to an unpopulated, or at least much less populated, area;

    m.  Negligently disposing of the PFAS-containing sediment of their manufacturing processes in a way that allowed PFAS to contaminate the environment.

263.    Contamination of and damage to the Budish Residence was reasonably foreseeable to Defendants as a result of their conduct.

264.    As a direct and proximate result of Menekaunee Defendants' negligence, toxic chemicals including PFAS were released into the environment, the ground water, the surface water, the air, and the soil, leading to the contamination of the Budish Residence.

265.    As a direct and proximate result of Menekaunee Defendants' negligence and the exposure to PFAS resulting therefrom, Plaintiffs have suffered, now suffer, and will continue to suffer, real property damage, out of pocket expense, personal and real property damage, loss of use and enjoyment of property, diminution in property value, and cost to remediate the Plaintiffs' property.

## SIXTH CLAIM FOR RELIEF AGAINST MENEKAUNEE DEFENDANTS

## ULTRAHAZARDOUS/ABNORMALLY DANGEROUS ACTIVITY /STRICT LIABILITY

266.    Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

267.    Menekaunee Defendants' dumping, emission, discharge, disposal, and distribution of material they knew or should have known was contaminated with PFAS throughout Marinette County constitutes an ultrahazardous activity.

268.    Menekaunee Defendants' dumping, emission, discharge, disposal, and distribution of material they knew or should have known was contaminated with PFAS throughout Marinette County is an abnormally dangerous activity and cannot be made safe by the exercise of the utmost care. The procedures used by Menekaunee Defendants in dumping, emission, discharge, disposal, and distribution of material they knew or should have known was contaminated with PFAS caused contamination of PFAS, which poses a high degree of risk to Plaintiffs.

269.    Menekaunee Defendants dumped PFAS-contaminated sediment in Marinette County in a way that caused contamination into the environment.

270.    Menekaunee Defendants knew or should have known the sediment, having been dredged downstream from a collection of AFFF manufacturers, were highly contaminated with PFAS toxins.

271.    These activities:

    a.    have a high degree, almost certain in fact, of causing significant harm to the person or lands of individuals like Plaintiffs;

    b.    cannot be made safe by the exercise of reasonable care;

    c.    are not a matter of common usage; and

    d.    were inappropriate in the locations where it took place.

272.    Menekaunee Defendants dumped this PFAS-contaminated sediment in Marinette County with no protection against PFAS release, otherwise allowing their toxic chemicals to pollute the water and soil in areas adjacent to residences like Plaintiffs' homes and properties. Menekaunee Defendants knew that their PFAS contaminants would leach into the ground water and be distributed by runoff to properties and water supplies like those owned by Plaintiffs.

Menekaunee Defendants' activities injured Plaintiffs and provided no value added to the community.

273.    Menakunee Defendants' ultra-hazardous activities – use, emission, discharge, disposal, distribution, spreading and/or spraying of PFAS-contaminated sediment – caused current actual harm and a high degree of risk of future harm to Plaintiffs.

274.    PFAS toxicity, persistence in the environment and in the human body, and other properties pose an inherent and extraordinary danger of lasting contamination of property and of threats to human health.

275.    The contamination of the property, drinking water, surface water and home of Plaintiffs were all probable and foreseeable consequences that resulted from the Menekaunee Defendants' use, emission, discharge, disposal, distribution and spraying of PFAS throughout Marinette County.

276.    Menekaunee Defendants' use, emission, discharge, disposal, distribution PFAS-contaminated sediment throughout Marinette County created a high degree of risk of harm to those who live in the surrounding area and substantially increased their risk of developing cancer and other illness, disease, or disease processes.

277.    The activities conducted by Menekaunee Defendants are exceedingly dangerous and offer little or no value to the surrounding community.

278.    Because these activities are ultrahazardous, Menekaunee Defendants are strictly liable for any damages proximately resulting therefrom.

279.    As a direct and proximate result of Menekaunee Defendants' negligence, toxic chemicals including PFAS were released into the environment, the ground water, the surface water, the air, and the soil, leading to the contamination of the Budish Residence.

280.    As a direct and proximate result of Menekaunee Defendants' conduct and the exposure to PFAS resulting therefrom, Plaintiffs now suffer, and will continue to suffer, real property damage, out of pocket expense, personal and real property damage, loss of use and enjoyment of property, diminution in property value, and cost to remediate the Plaintiffs' property.

## SEVENTH CLAIM FOR RELIEF AGAINST MENEKAUNEE DEFENDANTS

### PRIVATE NUISANCE

281.    Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

282.    At all times relevant hereto, Menekaunee Defendants knew or should have known PFAS to be hazardous and harmful to real property and humans, and it was substantially certain that their PFAS use, emission, discharge, disposal, and throughout Marinette County would injure Plaintiffs and their property.

283.    Menekaunee Defendants, through the negligent, reckless and/or intentional acts and omissions alleged have contaminated real property in Marinette County and the surrounding area.

284.    Menekaunee Defendants, through the negligent, reckless and/or intentional acts and omissions alleged have released PFAS chemicals onto Plaintiffs' land and have contaminated Plaintiffs' real property, drinking water and persons.

285.    Menekaunee Defendants' contamination of Plaintiffs' personal and real property with PFAS toxins has interfered with the rights of Plaintiffs to use and enjoy their property, causing them to suffer damages different in kind and degree from others in surrounding areas. Indeed, this interference is substantial. It has caused and is causing Plaintiffs to, among other things, refrain from fully using their property, using their contaminated soil to grow gardens, to refrain from using

contaminated water to drink, and is interfering with their ability to enjoy their property or water their pets, causing significant inconvenience, and expense.

286.    Menekaunee Defendants' conduct has also substantially interfered with Plaintiffs' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Plaintiff so chooses. It has reduced the value of their land.

287.    Menekaunee Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs.

288.    Plaintiffs, unlike the public generally, have suffered specific damages to their Property as a result of Manufacturing Defendants' tortious conduct.

289.    Menekaunee Defendants' emission, discharge, disposal, distribution, spreading and/or spraying of PFAS-contaminated materials and the contamination of Plaintiffs' property resulting therefrom constitutes a private nuisance. This nuisance has caused Plaintiffs to now suffer, and cause such suffering in the future, real property damage, out of pocket expense, personal and real property damage, loss of use and enjoyment of property, diminution in property value,  and cost to remediate the Plaintiffs' property.

## EIGHTH CLAIM FOR RELIEF AGAINST MENEKAUNEE DEFENDANTS

### TRESPASS

290.    Plaintiffs repeat, reallege, and incorporate by reference all allegations of this Complaint as if set forth more particularly at length here.

291.    At all times relevant hereto, Menekaunee Defendants knew or should have known PFAS chemicals to be hazardous and harmful to real property, animals and humans, and it was

substantially certain that their PFAS use, emission, discharge, disposal, distribution, spreading and/or spraying of PFAS-contaminated materials would injure Plaintiffs and their property.

292.    Menekaunee Defendants, through their activities alleged herein, allowed PFAS to enter and contaminate Plaintiffs' property.

293.    They intentionally, knowingly, and negligently gave tested, used, discharged, spread, deposited and/or sprayed toxic PFAS-contaminated materials, either through AFFF or through biosolids, knowing that those toxins would contaminate the real property and drinking water of individuals like Plaintiffs.

294.    Menekaunee Defendants also, through their activities alleged herein, authorized, requested, or caused others to dispose of waste in a manner which they knew was substantially likely to cause PFAS to enter and contaminate Plaintiffs' property. Through their actions in intentionally causing others to spread their waste, they intentionally, knowingly, and negligently caused PFAS-contaminated materials to enter Plaintiffs' land, water, soil, and home

295.    At all times, Menekaunee Defendants knew that their conduct in disposing of PFAS-contaminated materials contradicted Plaintiffs' rights in their property.

296.    At all times, Menekaunee Defendants' conduct displayed indifference to and disregard for Plaintiffs' rights to their land.

297.    Menekaunee Defendants, through their PFAS use and disposal activities alleged failed to act in the matter of an ordinary, careful person or business.

298.    Menekaunee Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' real and personal property with PFAS toxins has interfered with the rights of Plaintiffs to use and enjoy their property and constitutes trespass and continuing

trespass. Defendants' trespass has substantially impaired Plaintiffs' rights in the use and enjoyment of their property as well as property damage as alleged above.

299.    Menekaunee Defendants' trespass has also interfered with and continues to interfere with Plaintiffs' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that each Plaintiff so chooses.

300.    Menekaunee Defendants' trespass has proximately caused (presently and in the future) contamination of Plaintiffs' real and personal property, out-of-pocket expense, loss of use and enjoyment of property, diminution in property value, and cost to remediate the Plaintiffs' property.

## PUNITIVE DAMAGES

301.    Plaintiffs hereby repeat, reallege, and reiterate each and every allegation in the preceding paragraphs as if fully restated herein.

302.    Upon information and belief, Defendants engaged in willful, wanton, malicious, and/or reckless conduct that caused property damage, nuisances, and trespasses upon the persons and property of Plaintiffs, disregarding their protected rights.

303.    Defendants' willful, wanton, malicious, and/or reckless conduct includes but is not limited to Defendants' failure to take all reasonable measures to ensure PFAS containing materials would be effectively disposed of and not discharged into the surrounding environment and groundwater supplies.

304.    Defendants have caused great harm to the property, water supplies of Plaintiffs and demonstrated an outrageous conscious disregard for their safety with implied malice, warranting the imposition of punitive damages.

305.    Defendants committed each of the above-described acts and omissions knowingly, willfully, and with oppression, fraud and/or malice, in conscious disregard of the probable dangerous consequences of that conduct and its reasonably foreseeable impacts on Therefore, Plaintiffs request an award of punitive damages in an amount enough to punish the Defendants and that fairly reflects the aggravating circumstances alleged herein.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs demand judgment against Defendants, and each of them, jointly and severally, and request the following relief from the Court:

A.    A declaration that Defendants acted with negligence, gross negligence, and/or willful, wanton, and careless disregard for the health, safety, and property of Plaintiffs;

B.    An award to Plaintiffs of general, compensatory, exemplary, consequential, nominal, and punitive damages for their personal and real property damage(s);

C.    An order for an award of attorney fees and costs, as provided by law;

D.    An award of pre-judgment and post-judgment interest as provided by law; and

E.    An order for all such other relief the Court deems just and proper.

Dated at Milwaukee, Wisconsin this 5th day of July, 2023.

Attorneys for Plaintiffs,

/s/ Casey P. Shorts
Casey P. Shorts
State Bar No. 1086253
The Previant Law Firm, S.C.
310 W. Wisconsin Avenue, Suite 100MW
Milwaukee, WI 53203
Tel.: (414) 271-4500
cps@previant.com